

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF OREGON**

DAVID W. HERCHER
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1538

COLLIN M. COLE
LAW CLERK

DORIA D. ARNTSEN
JUDICIAL ASSISTANT

NOT FOR PUBLICATION

Juan C. Chavez
VIA ECF ONLY

Randy Bowman
17065 Brown Road
Dallas, OR 97338

Subject: James Joseph Brown v. Randy Bowman
Adversary Proceeding No. 17-06043-dwh

Greetings:

I write to explain my separate Judgment for Defendant. In the judgment, I rule for defendant, Randy Bowman; I determine that the claim of plaintiff, James Joseph Brown, against Bowman at issue in this action is dischargeable. This letter constitutes my findings of fact and conclusions of law in support of the judgment.

### I. Procedural history

Bowman commenced the main case in which this adversary proceeding is pending by filing a chapter 7 petition in this court on March 2, 2017.[1]

Brown commenced this action by filing his Complaint for Determination of Dischargeability on June 13, 2017.[2] This court has jurisdiction under 28 U.S.C. §§ 157 and 1334; this action is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

In the complaint, Brown alleges that, on one occasion, Bowman threw a ball of Saran Wrap at Brown's head and over three occasions grabbed, shook, threw, walked into, grappled with, and choked Brown, causing him physical pain and emotional and mental distress. The parties later entered into an agreement settling a federal district-court action brought by Brown against Bowman. Bowman agreed to pay $12,000, on which he made only one payment of $1,500 before filing his petition.

Brown seeks determinations of nondischargeability under both sections 523(a)(2) and (6) with respect to Brown's claim against Bowman for $10,500—the amount due under the

---

[1] Main case No. 17-60575-dwh7, docket item 1.
[2] Adversary Proceeding No. 17-06043-dwh, docket item 1. Unless otherwise specified, references to "docket item" are to numbers of docket items in the adversary proceeding.

settlement agreement—plus interest. He also requests judgment for the $350 complaint-filing fee, plus interest, which he requests also be declared nondischargeable.

Bowman filed his answer on July 26, 2017.[3] The trial was on November 28, 2017. Brown was represented by Juan C. Chavez; Bowman represented himself.

## II.     Evidence

### A.     Background

In 2014, certain prisoners in the custody of the Oregon Department of Corrections (DOC) were assigned to work in forest work camps under the supervision of the Oregon Department of Forestry. Bowman worked for Forestry as a forest inmate crew coordinator. From late 2013 or early 2014 through April 16, 2014, Brown was a member of a 10-member inmate work crew supervised by Bowman and working at the South Fork Forest Camp. When Bowman's crew was working in the forest, Bowman as crew coordinator was the only nonprisoner present.

According to Brown, he was at South Fork for 24 months. For a prisoner to be qualified for participation in a forest crew, a prisoner must be "level 1," with no history of violent crime, discipline, or charges. Brown said that to qualify for assignment to a forest work crew, an inmate can't have committed any acts of violence while in DOC custody. It's also possible that inmates convicted for Measure 11 offenses are disqualified.

Bowman admitted these allegations of the complaint: In March 2016, Brown sued Bowman in U.S. District Court in Portland, alleging that Bowman violated the U.S. Constitution's Fourth Amendment by using force against Brown.[4] In November 2016, the parties entered into a settlement agreement, in which Bowman agreed to pay Brown $12,000, with $1,500 paid upon signing and the balance to be paid in monthly installments of $1,500.[5] Bowman made the downpayment but no other installment payments. In January 2017, Bowman told Brown that he would not make any further payments, but he would instead file for bankruptcy.[6]

### B.     The four alleged attacks by Bowman against Brown

#### 1.     First alleged attack

##### (a)     Brown's testimony

Brown did not recall or offer in evidence any record of the specific dates for any of the alleged attacks he recounted.

In the first or second week of March 2014, the crew was planting trees. The ten crew members were in a line. Brown was second in line, and he and the inmate first in line ahead of Brown were "way ahead" of the remaining eight crew members and Bowman. Brown was

---

[3] Docket item 4.
[4] Complaint at 3, ¶ 10.
[5] Complaint at 3, ¶ 11.
[6] Complaint at 4, ¶ 12.

wearing a tree bag, in which he carried 50 trees on each of his right and left sides, and he was holding a shovel used for tree planting.

According to Brown, after the crew had been planting for 30 to 60 minutes, Bowman grabbed Brown by the front of his sweatshirt and pushed Brown forward and back three times and then threw Brown into sticker bushes. Brown stood up and said to Bowman, "Hey, what the hell are you doing?" Bowman replied, "Don't be a pussy, just get back to work," and then Bowman "just trotted off." Brown was astounded and baffled at Bowman's behavior.

Brown did not report the first alleged attack to the DOC. Brown claims that an inmate should "handle your own business as a man," rather than "snitch" to authorities on anyone, whether a fellow inmate or a DOC or Forestry supervisor. Brown claims that other "very violent, serious inmates" would not tolerate an inmate who "rats" or snitches on anyone—even a Forestry supervisor, such as Bowman.

On cross-examination, Brown also said that he weighed 145 pounds, and the trees in his bag weighed 50 pounds; and Bowman didn't literally throw Brown, but rather grabbed and pushed Brown, who landed five to ten feet away in bushes.

    *(a)*    ***Bowman's testimony***

Bowman denied that the first alleged attack occurred.

    **2.**    **Second alleged attack**

    *(a)*    ***Brown's testimony***

In a shop area at the camp, the inmate crew had lunch consisting of sandwiches wrapped in Saran Wrap. The inmates had bundled the Saran Wrap into a ball and were tossing it around. Bowman grabbed the ball and threw it like a baseball at Brown, bouncing it off his head. Bowman caught the ball, laughed, and walked off.

Brown also did not report the second alleged attack to the DOC, even though other inmates in the crew urged him to do so. Brown said he refused to report because he wanted to stay at the camp.

On cross-examination, Brown said that it was not typical for the crew to eat lunch in the pole barn area and that he knew of no reason why the incident occurred.

    *(b)*    ***Bowman's testimony***

Bowman said that the second alleged attack didn't occur. Lunch time was Bowman's personal time to get away from the crew and calm himself down, and he would usually eat in the cab of his "crummy" (truck).

3.  **Third alleged attack**

    *(a)   Brown's testimony*

    According to Brown, the third alleged attack occurred one week after the second incident. The crew was working on maintenance of a trail near the camp, cleaning erosion from the uphill embankment and throwing it down the side of the hill.

    Bowman came up behind Brown, bumped into him, and shouldered him into the embankment. Brown asked, "What are you doing? Why are you doing this?" Bowman got into a football stance, and Brown thought Bowman planned to wrestle or tackle Brown and throw him on the ground. To get away, Brown turned around and ran up the trail away from Bowman. Bowman put Brown in a wrestling hold, choked him, and pinned him against the embankment. Brown asked, "What the hell are you thinking? Don't touch me again." Bowman replied, "Don't be a pussy; get back to work. I was just messing around."

    At lunch later that day, other inmates urged Brown to do something, but he didn't, because he didn't want to be a snitch or to be removed from the camp. Brown just wanted to be on a different crew, away from Bowman, at the same camp.

    *(a)   Bowman's testimony*

    Bowman denied that the third alleged attack occurred. He thought its description was closest to an incident that did occur on March 11, 2014.

    Bowman carried and used a daily planner, which Forestry issued to him as a crew boss. The pages from his 2014 planner for February through April (two pages for each month) were admitted as Exhibits A through C. For each month, the first page was a standard month calendar grid with a cell for each day, and the second page is lined and headed "Master Task List." Bowman used the calendar to note work assignments and days off.

    Forestry's policy for inmate crew supervisors, such as Bowman, is to document any incidents with inmates and to use the least appropriate response so as not to negatively affect inmates' eligibility to be at a level 1 facility, such as South Fork.

    On March 11, Bowman was directing a group of inmates, not including Brown, to jack-hammer solid rock. Brown came jogging up the trail and "shouldered" Bowman, while giggling. Bowman grabbed Brown's left arm and folded it behind Brown's shoulder because Brown was being a smart-aleck and threatening Bowman's authority over the crew.

    On that date, Bowman grabbed Brown by Brown's left shoulder and left arm. Bowman didn't wrap his arm around Brown's neck, nor did he throw Brown on an embankment with Brown on top of Bowman with nine other inmates watching.

    On March 11, Bowman made the following hand-written note in his planner (on the second page of Exhibit A):

"3-11-14

"While constructing trail at Jones Cr. inmate Brown walked past me and intentionally shouldered into my back and laughed afterward. At that point I grabbed him by his shoulder and told him that kind of disrespect would not be tolerated, and if it happens again he would receive a daily failure. He apologized and said it wouldn't happen again.

"No paperwork filed. Feel the issue was handled at lowest level possible."

In Bowman's experience, inmates in forest work crews had previously been locked up in prison for several years. At the South Fork camp they experience—and react to—new, although controlled, freedom. Under the supervision of the crew boss, forest-crew inmates can "run around and goof off and have fun," which they couldn't do in prison. Bowman characterized Brown's shouldering of Bowman as "goofing off."

Other inmates complained to Bowman about Brown, but Bowman did not document those complaints in his planner.

On cross-examination, Bowman said that he used force "reactively"; he had not been trained to use force; he had been trained in de-escalation techniques, of which reactively using force is not one.

### 4. Fourth alleged attack

#### *(a)* *Brown's testimony*

According to Brown, the fourth alleged attack occurred about one week after the third incident. The crew was on a trail doing cleanup work. Brown was talking loudly to another inmate and joking around. Bowman said, "Brown, shut your f'ing mouth, I don't want to hear your voice today." Brown walked directly up to Bowman and said:

"Listen, hey. What the hell's going on between you and me? I've never done anything to you. You continue to treat me like this. You're grabbing me. You're in my face. Something's gotta give. This has gotta quit. And today's the day it quits."

In response, Bowman told Brown, "Turn around, get down the trail, and you're fired. You're no longer on my crew. You've got one week to find another prison crew to be on." Brown turned, and Bowman grabbed Brown's shoulders, spun him around, and pushed him, saying, "Get down the trail. You're fired."

On cross-examination, Brown said that he knew of no reason why the attack occurred. He agreed that he received the "failure for attitude" form from Bowman that day. Brown said that he wasn't being confrontational with the other inmate to whom Brown directed his comments, but he and the other inmate were just playing around and are still friends today. He couldn't recall the friend's name.

### *(b)* *Bowman's testimony*

Bowman said that the day on which he issued the "failure for attitude" form—the day of Brown's alleged fourth alleged attack—was April 16, 2014. That day, the crew was repairing the Gales Creek Trail. The 10 crew members were spread out on a 200 to 300-foot section of trail. Bowman was in the back working with inmates other than Brown.

Brown was 40 to 50 feet away from Bowman. Bowman heard Brown yelling at another inmate in a hostile and disrespectful manner while holding a hazel hoe, a tool for scraping trail tread. It wasn't the first time that Bowman had heard Brown yelling at another inmate in that way or otherwise disrespected other crew members. Brown liked to yell and scream, and he was Bowman's "troubled child" on the crew. Bowman yelled at Brown to "shut up."

In his planner, Brown wrote "Gales Cr" on each of April 15 through 17, 2014. On the April Master Task List, Bowman made the following entry for April 16:

"4-16-14

"Inmate Brown was telling another inmate what to do in a very hostile and disrespectful manner calling him a 'wissel dick mother fucker' at which time I told inmate Brown to shut up and focus on this work. Inmate Brown then turned and walked toward me telling me not to tell him to shut up. He was very hostile in his tone and demeanor as he fronted me and I gave him two direct orders to just leave it and get back to work. He did not comply until I told him the third direct order with him noncompliance would result in a 'roll-up.' I informed him that he would receive a daily failure do to his attitude with me."

Brown walked 20 or 30 feet up the trail to stand face-to-face with Bowman, telling Bowman in a very hostile tone and demeanor not to tell Brown to shut up, all while holding his hazel hoe. Bowman gave two direct orders to "leave it alone and get back to work" before Brown complied.

At the end of that day, Bowman issued the "daily failure" form to Brown. Issuance of the daily failure on April 16 meant that Brown could no longer work on Bowman's crew.

Bowman said that Brown lied about the April 16 attack, and Bowman characterized the lie as retaliation for Bowman issuing to Brown a third and final daily failure, which meant that Brown could no longer work on Bowman's crew. Upon issuance of a third daily failure, it was up to the DOC to decide whether Brown could stay at South Fork.

Bowman disputed Brown's testimony that an inmate would face mistreatment by other prisoners for ratting or snitching on a Forestry staff member. From Bowman's training and discussions with other inmates, he understood that an inmate could face mistreatment for snitching on another inmate. But an inmate snitching on a staff member, whether the staff worked for the DOC or Forestry, would be admired by other inmates. Snitching on a staff member would be treated by other inmates as "a big win" for the snitching inmate, and others would think or say to him "you sure showed him." Anytime inmates can "get something over on a staff member, that's a plus for them," and the event "goes down in the win column."

Bowman's Master Task List entry for the following day, April 17, reads:

"4-17-14 @ 0800 inmate Brown asked to talk to me in the cab at the crummy. He handed me a kyte to sign for his release. He told me that he wants no hard feelings and would appreciate me not saying anything bad about him to the crew bosses thus hindering his ability to get on another crew. I told him that is not how I operate and that I would simply tell the truth about this work and attitude on the job. At which point I signed his kyte and the conversation ended. We went to work."

A copy of the "kyte," the form by which Brown requested release from Bowman's crew, was admitted as Exhibit E. It is dated April 16, identifies the failure date as April 16, and states that the reason for the failure was "attitude."

Bowman told the state internal investigator that, on that day, he told Brown to "shut up," which was less than professional. Bowman denied touching Brown that day.

### 5. State investigation of Bowman and inmates' treatment of Brown

According to Brown, later on the day of the fourth alleged attack, when the crew was back at the camp, four other inmates suggested that Brown report Bowman to the head DOC officer at the camp, so that Brown could stay on the crew. Standing three feet away was an inmate clerk for Forestry, who was a friend of the camp commander; the clerk heard the whole conversation.

At the end of the day, the shift camp commander, Lieutenant Wiley, called Brown to the camp and told Brown, "We have a major problem" and then asked Brown to explain everything going on between Brown and Bowman. Wiley told Brown, "We know everything. We'll have a major investigation and have the entire crew interviewed by Internal Affairs." Brown told Wiley that Brown and Bowman "have a good relationship, no problem." When Wiley again pressed Brown, Brown said, "I don't want to be a snitch for the rest of my two-year sentence."

That evening, Brown found another crew to join. The next day, at Brown's request, Bowman signed a form permitting Brown to transfer to the other crew.

About 60 days later, Brown testified in the internal investigation of Bowman, and Brown's testimony there was consistent with his bankruptcy-court testimony. As a result of that investigation, Bowman was terminated.

After Bowman's termination, Brown was harassed and threatened by other inmates. At the suggestion of some inmates concerned about threats to Brown, the DOC transferred him to the Mill Creek facility in Salem, Oregon, which is also a level 1 facility. On Brown's first day at Mill Creek, he was threatened by Mill Creek inmates who had been in touch with South Fork inmates who had threatened Brown for having snitched. According to Brown, he was told, "you better have some answers, because we're looking for any statement that you snitched; if we get it, we're going to smash you out."

Brown was transferred from the Mill Creek facility to the Columbia River facility for drug and alcohol treatment. Inmates in the treatment program are isolated from the general inmate population there. After arriving at Columbia River, Brown had to spend five days in the general population before he was admitted to the treatment program. On his first day at Columbia River, four gang members from South Fork approached him in the yard and told him, "Don't come outside again, or we're going to smash you. Don't talk to or sit around us."

Brown was released from DOC custody in 2016.

### 6. Bowman's training, experience, and termination

According to Bowman, before the alleged attacks on Brown, Bowman had worked at South Fork for eight years with great success and no allegations such as Brown's or that Bowman had been angry or engaged in violence. A list of state training classes that Bowman had completed from 2006 through 2014 was admitted as Exhibit G. The classes included several hosted by the DOC.

On cross-examination, Bowman said that he had been dismissed from state employment after allegations by several inmates of alleged improper behavior, and that the grounds for dismissal were conducting himself in a less-than-professional manner, using physical force, and his failure to follow guidelines and to report the March 11 alleged attack. At the request of Brown, the court admitted Exhibit 1, a pre-termination letter from the state to Bowman. But Brown did not request or obtain Bowman's general acknowledgment to the truth of the matters stated in that letter.

### C. District court action and settlement

#### (a) Brown's testimony

Brown sued Bowman and others in district court in 2016 and served the complaint on Bowman in October 2016.

As of November 18, 2016, the parties entered into a settlement and release agreement, a copy of which was admitted as Exhibit 2. The parties agreed that the settlement was in compromise of disputed claims, and neither the payment nor the release would be construed as an admission of liability or guilt by any party. The agreement required Bowman to pay Brown $12,000, paying $1,500 upon execution and then $1,500 per month thereafter, without interest, until the full amount had been paid. Bowman made only the initial installment payment of $1,500, leaving $10,500 unpaid.

Brown said that he would not have entered into the settlement agreement had he known that Bowman had no way to pay Brown.

#### (b) Bowman's testimony

At the time of the settlement, Bowman was in custody at the Tillamook County Correctional Facility awaiting trial. (The record does not disclose the nature of the charges he faced, nor does Brown contend that the pendency or resolution of those charges has any

relevance to this action.) Bowman had no income, very few assets, and no bank account, and he owed debts to creditors other than Brown. As part of the resolution of the matter for which Bowman was awaiting trial, the court fined Bowman $1,223. On December 14, 2016, his mother paid the fine on his behalf, and he was released.

Bowman was unemployed after his release until January 10, 2017, when he began working for an income of around $2,500 per month.

Bowman borrowed $4,017.49 to make the $1,500 payment to Brown and to pay the balance to Bowman's lawyer. Bowman assumed and understood that his family would "cover" or "help with" the future installment payments due to Brown. His grandmother created an account with several thousand dollars to help Bowman pay Brown. But she was then diagnosed with cancer and needed to use those funds for her own care and was unable to provide them to Bowman.

### III. Analysis

The prayer of the complaint requests that Bowman's debt under the settlement agreement be declared nondischargeable. Bowman does not identify any other debt that he seeks to be declared nondischargeable. Brown requests a declaration of nondischargeability under both paragraphs (2) and (6) of section 523(a).

#### A. *I believe Bowman, and not Brown's inconsistent testimony.*

I believe the testimony of Bowman, and I disbelieve the inconsistent testimony of Brown, not only based on their demeanors as trial witnesses but also on aspects of the events they described and the documentary evidence.

1. From my observation of Bowman as a witness, I perceived him to be thoughtful and not to be likely to lash out at someone for no reason or even to overreact to provocation.

2. Bowman's explanation that prisoners would receive congratulations, rather than threats, for snitching on a staff member was credible, and it seems more logical than Brown's contrary story.

3. Through the period in which he was at South Fork, Brown's only reported interactions with other inmates regarding whether he should report Bowman were ones in which the other inmates supported him and urged him to report; that occurred in connection with the second through fourth alleged attacks. The consistent support he received from other inmates at South Fork undercuts his story that he feared retaliation if he had reported Bowman. Brown did testify to threats made to him when he was later at the Mill Creek and Columbia River facilities. But coming after he had left South Fork, the later threats don't explain his decision not to report Bowman while Brown was at South Fork.

4. Bowman's contemporaneous written records of the events on March 11 and April 16 and 17 corroborate his testimony about the events on those dates.

5. Brown's inability to identify any motive for Bowman to attack Brown undercuts Brown's credibility. As a matter of human nature, unmotivated attacks are unusual.

6. Recounting the third alleged attack, Brown described his interaction with the other inmate as "just playing around" and said that the other inmate and he "are still friends today." Although Brown's minimizing account of the alleged attack is not fundamentally inconsistent with Bowman's account that Brown was loud and rude to the other inmate, Brown's inability to recall the name of the other inmate, despite remaining friends with him, undercuts his credibility.

### B. Brown has not proved a section 523(a)(2) claim.

#### 1. Brown's claim is under section 523(a)(2)(A).

In his trial memorandum, Brown asserts that the paragraph in section 523(a)(2) on which he relies is paragraph (A). That paragraph makes nondischargeable a claim "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

In the complaint, Brown alleges that (1) when Bowman offered to settle with Brown, Bowman knowingly made—by his silence—the false representation that he would pay, despite knowing that he did not intend to pay,[7] and (2) Brown acted in reliance upon Bowman's false representations when Brown settled.[8]

#### 2. Bowman did not misrepresent his intent or ability to pay.

In the complaint, Brown alleged that Bowman misrepresented his intent to pay the settlement agreement installments, but said nothing of Bowman's ability to pay. In Brown's trial memorandum and at trial, Brown raised, without objection by Bowman, the additional allegation that Bowman impliedly misrepresented his ability to pay.

I believe Bowman's unrebutted testimony that he expected financial assistance from his grandmother or other family members to make the settlement payments. Even though Bowman had few assets of his own, his belief that his family would fund the payments means that he misrepresented neither his intent nor ability to pay. I therefore find that Bowman made no misrepresentation when he entered into the settlement agreement.

Even if Bowman had misrepresented his intent or ability to pay, Brown did not demonstrate that he incurred damages from that representation. Based on the prayer of the complaint, Brown seems to believe that if he proves fraud, he will be entitled to a judgment for the balance due under the settlement agreement. But the measure of damages would be the difference between the $1,500 that Bowman did pay and the amount that Brown would have recovered absent settlement. Absent settlement, Brown would have recovered only if he had

---

[7] Complaint at 4, ¶ 14.
[8] *Id.* at 4, ¶ 15.

prevailed in an action against Bowman and recovered a net amount (i.e., after payment of his additional attorney fees and costs) greater than $1,500. But below, I find against Brown on his Eighth Amendment claim against Bowman—the only claim that Brown asserts in this action. Thus, based on the record of this case, absent settlement, Brown could not have prevailed against Bowman and thus did not prove misrepresentation damages.

### C. Brown has not proved a section 523(a)(6) claim.

Even if a settlement agreement is not procured by fraud, the debt evidenced by the agreement may be nondischargeable if and to the extent that the agreement was made to pay or settle another claim that was itself nondischargeable. In the Supreme Court's 2003 decision in *Archer v. Warner*,[9] the Court held that a debt for money promised in a settlement agreement settling and releasing creditors' prior state-law fraud claims could amount to a debt for money obtained by fraud under section 523(a)(2)(A). Thus, even though I find that Bowman did not defraud Brown in entering into the agreement, the settlement-agreement debt could be nondischargeable if and to the extent that the agreement was made in settlement and release of a nondischargeable claim, such as the debt that Brown alleges is nondischargeable under section 523(a)(6).

#### 1. A nonbankruptcy tort is a required element of a section 523(a)(6) claim.

Brown claims in the complaint that his claim against Bowman is nondischargeable under section 523(a)(6). That section makes nondischargeable a debt "for willful and malicious injury to another entity or the property of another entity."

In the Ninth Circuit's 2008 decision in *In re Lockerby*, the court held that tortious conduct is a required element for a finding of nondischargeability under section 523(a)(6).[10] To be tortious under that section, conduct must constitute a tort under nonbankruptcy law.[11]

In his trial memorandum, Brown claims that the willful and malicious injury occurred when Bowman "attacked" Brown. Brown describes the nonbankruptcy law basis for his section 523(a)(6) claim as "[a]n action for excessive force within the context of incarceration," which "invokes the Eighth Amendment of the United States Constitution."[12] Brown has not identified any other nonbankruptcy tort that would support his section 523(a)(6) claim. As support for the existence of an excessive-force claim, Brown cites several cases addressing the elements of such a claim. His discussion of Eighth Amendment case law addresses the law applicable to prison guards; although Brown observes that Bowman was not a prison guard, Brown does not point to any test for evaluating the Eighth Amendment claim against Bowman other than the law applicable to claims against prison guards.

---

[9] 538 U.S. 314 (2003).
[10] 535 F.3d 1038, 1040-41 (9th Cir. 2008).
[11] *Id.* at 1041-42.
[12] Plaintiff's Trial Memorandum at 6.

### 2. Brown has not proved the nonbankruptcy tort of excessive force.

In the Supreme Court's 1992 decision in *Hudson v. McMillian*, cited by Brown, the Court held that the "core judicial inquiry" in addressing an Eighth Amendment excessive-force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[13] The Court also held that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"[14]

I have found Bowman credible, and Brown not credible, regarding the four alleged attacks by Bowman. Specifically, I believe Bowman's testimony that the first and second attacks alleged by Brown did not occur and that the third and fourth alleged attacks did not occur in a way that violated Brown's Eighth Amendment rights.

With respect to the third alleged attack, I believe Bowman's testimony that Brown intentionally shouldered Bowman in the back and laughed afterward, and Bowman grabbed Brown by his shoulder and told him that disrespecting Bowman in that manner would not be tolerated. I find that Bowman applied force to Brown in a good-faith effort to maintain or restore discipline, rather than maliciously and sadistically to cause harm. Brown never identified any motive for Bowman to behave as Brown claimed, much less a motive that would support a finding that Bowman acted maliciously and sadistically to cause harm. I also find that the force Bowman used on Brown was *de minimis* and not the sort that is repugnant to the conscience of mankind. In making those findings, I take particular note that the incident occurred in a remote forest setting in which Bowman was the only state representative supervising ten DOC inmates (albeit ones cleared for that assignment). Outside the secure environment of a prison and without the quick access to the assistance of others, Bowman faced the risk that one or more of the inmates could overpower him or escape, thus heightening the need for him to act promptly and decisively to maintain or restore discipline. Thus, Bowman's use of force against Brown was not excessive under the Eighth Amendment.

On cross-examination, Bowman said that he used force "reactively"; he had not been trained to use force; and he had been trained in de-escalation techniques, of which reactively using force is not one. But Brown did not explain why Bowman's reactive use of force or his de-escalation training requires a finding that Bowman acted maliciously and sadistically to cause harm.

With respect to the fourth alleged attack, I believe Bowman's testimony that he did not touch Brown; that Brown was loudly and rudely yelling at another inmate; that Bowman told Brown to shut up; and that Brown faced off with Bowman and acted very hostile in tone and demeanor in demanding, while holding a tool, that Bowman not tell Brown to shut up. Bowman's vocal, but not physical, interaction with Brown was not force within the meaning of the Eighth Amendment. In any case, for the same reasons that that the third alleged attack did not constitute an Eighth Amendment violation—and the additional reason that Brown rejected

---

[13] 503 U.S. 1, 7 (1992), quoted in *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).
[14] 503 U.S. at 9 (internal citation omitted), quoted in *Wilkins*, 559 U.S. at 37-38.

Bowman's authority with hostility while confronting Bowman holding a tool that could have been used as a weapon—neither did the fourth incident.

Because Bowman did not violate Brown's constitutional right to be free of excessive force, Bowman was not, before entering into the settlement agreement, liable to Brown in tort. Thus, I need not address the other elements of a section 523(a)(6) claim (whether any debt is for willful and malicious injury). Because Bowman had no liability in tort to Brown, no part of the contract debt represented by the settlement agreement is a debt "for" willful and malicious injury, and thus no portion of that debt is nondischargeable under section 523(a)(6).

## IV. Conclusion

With respect to Brown's section 523(a)(2) claim, I find that Brown has failed to prove that Bowman defrauded Brown when Bowman entered into the settlement agreement. With respect to Brown's section 523(a)(6) claim, I find that Brown has failed to prove that Bowman was liable to Brown for use of excessive force and thus no part of the settlement agreement is for a willful and malicious injury.

I will enter judgment for Bowman.

Sincerely,

*David W. Hercher*

DAVID W. HERCHER
Bankruptcy Judge